## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## CASE NO. 1:19-cv-01229-LCB-LPA

| | | |
|---|---|---|
| **ANDRE FLOYD CHAMBERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **DEFENDANT WAKE FOREST** |
| **v.** | ) | **BAPTIST MEDICAL CENTER'S** |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| **WAKE FOREST UNIVERSITY** | ) | **MOTION FOR SUMMARY** |
| **BAPTIST MEDICAL CENTER,** | ) | **JUDGMENT** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## STATEMENT OF THE NATURE OF THE MATTER BEFORE THE COURT

Chambers filed this action, *pro se,* on December 17, 2019. **[Doc. 2]** Following

service, Defendant filed its Answer on April 23, 2020. **[Doc. 5]**  In his Complaint,

Chambers (African American male) asserted the following claims:  race and gender

discrimination and retaliation based on a failure to promote and race and gender harassment

in violation of Title VII of the Civil Rights Act, as amended ("Title VII").[1] Chambers

obtained counsel on August 3, 2020 **[Doc. 14]**.

Chambers signed his EEOC Charge of Discrimination on February 15, 2019. His

Charge states that the earliest this alleged discrimination took place was June 28, 2018, and

---

[1] During his deposition, Chambers alleged slander; however, he has never amended his
Complaint to add such a claim. As such, Defendant submits that there is not an
independent slander claim in front of the Court.

that it last took place on December 3, 2018. **See Deposition of Catherine McMath ("McMath Dep."), Ex. 16.** The Notice of Charge issued to WFUBMC was dated February 21, 2019. **Affidavit of Tonya Robbins ("Robbins Aff."), ¶ 21.** The EEOC issued its Dismissal and Notice of Rights on September 19, 2019. **[Doc. 2, page 10]**

Chambers cannot present evidence establishing that race or gender was the reason for his non-selection, that he has been retaliated against, or that he has been subjected to a legally hostile work environment due to his race or gender. Accordingly, no genuine issue of material fact exists on the questions before this Court and WFUBMC is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

*Chambers' Early Employment History*

Chambers' applied for a position with WFUBMC on July 31, 2015. **Deposition of Chambers ("Chambers Dep."), Ex. 1.** Linda Childers (White female), Department Manager, Diane Campo (White female), Manager, and Cynthia Eglinger (White female), Care Coordination Supervisor interviewed Chambers for the Social Worker position. **Deposition of Cynthia Eglinger ("Eglinger Dep.") at 25-26; Affidavit of Linda Childers ("Childers Aff.") at ¶5.** Childers noted prior to interviewing Chambers that his lack of hospital experience was a concern. **Eglinger Dep. at 27 and Childers Aff. at ¶5.** However, the lack of hospital experience did not make him unqualified for the job and his otherwise good experience outweighed this concern. **Id.** Ultimately, Childers, Campo, and

2

Eglinger chose Chambers for the position. **Eglinger Dep. at 25-27; Deposition of Linda Childers ("Childers Dep.") at 24.**

Despite his resume indicating that he was provisionally licensed as a North Carolina social worker ("LCSW-A"), Chambers was not in fact provisionally licensed when he began working for WFUBMC. **Chambers Dep. at 39-41.** His license had expired on March 31, 2015. **Id. and Childers Aff. at ¶24.** While being an LCSW-A was considered preferential, the licensure was not required for the Social Worker position. **Id. at 7.**

Chambers was a good social worker in terms of the mechanics of his job, relating well with the patients, and was thought of highly by several individuals. **Eglinger Dep. at 43.** His work in the Care Coordination Department earned him recognition as the employee of the month in April 2017, the first of two such awards he received during his tenure. **Chambers Dep. at 93-94, Ex. 6.** Childers congratulated him on the award and thanked him for all he did. **Id.**

Childers completed Mr. Chambers' annual performance review in the summer of 2018 and rated Chambers as a meets or exceeds expectations in all areas. **Childers Aff. at ¶12.**

*Susan McKearney Incidents*

In February 2018 Chambers contacted Employee Relations ("ER") to report his expectation that Susan McKearney (White female) was going to bring a complaint against him. **Chambers Dep. at 106; McMath Dep. 45-46, 52; McMath Aff. at ¶3.** Chambers

3

reached out to Employee Relations in an attempt to preempt a complaint from any of his coworkers. **Chambers Dep. at 107; McMath Aff. 3.** Chambers believed McKearney was spreading rumors about him and he was fearful for his job. **Chambers Dep. at 122-123; McMath Aff. ¶3.** In a second report Chambers noted he believed two employees (McKearney and Brandy Forbes) were making false accusations about him being vulgar, threatening, and antagonizing. **Chambers Dep. at 132-34; McMath Aff. ¶3.** McKearney never told Chambers she reported him or his alleged bad behavior. **Chambers Dep. at 126.**

McMath investigated the claims and contacted Dr. Harmon, McKearney's and Forbes' supervisor. **McMath Aff. ¶10, Ex. B.** Neither McKearney nor Forbes filed a report against Chambers. **Id.** McMath instructed Harmon to counsel McKearney and Forbes to be mindful of their behavior and not to make any statements that could tarnish Chambers' reputation. None of the allegations brought forth by Chambers were based on him having directly heard any of the alleged comments by McKearney or Forbes. **McMath Aff. Ex. A, pages 1-2 and B.** McMath advised Chambers on March 15, 2018 that she was following up with McKearney's supervisor and that while she could not share with him what, if any disciplinary outcome would take place for McKearney and Forbes, she was investigating the matter. **McMath Aff. Ex. A, page 2.** Childers and Eglinger supported Chambers throughout the investigation and noted that if he did not feel comfortable dealing directly with McKearney, or he had any concerns, he could go through Eglinger and if she was not

available through Childers. **McMath Aff. Ex. A, page 1.** Chambers was unaware if McKearney ever filed a complaint against him. **Chambers Dep. at 107.** No complaints were ever filed. **McMath Aff. ¶7**

*Chanelle Ward Incidents*

On June 12, 2018, Chambers reported that Chanelle Ward (African American female) was accusing him of committing fraud in regard to a precertification ("pre-cert") for Blue Cross Blue Shield. **McMath Dep. at 74-75, Ex. 11; McMath Aff. ¶15, 16, 19, Ex. G; Childers Aff. ¶11.** Chambers believed that Ward was not following the providers' wishes so he took over the pre-certification call. Ward believed that Chambers misrepresented what was in the file in order to get the pre-cert completed. **Id.; Chambers Dep. at 195-96.**

On June 13, 2018, Mustamaa reached out to McMath for support on the investigation. **McMath Dep. at 74-75, Ex. 11.** While WFUBMC attempted to obtain the recording of the pre-cert call from Blue Cross Blue Shield, they were unable to do so. **Chambers Dep. at 161-62; McMath Dep. at 74-75, Ex. 11; McMath Aff. ¶15, 16, 19, Ex. G; Childers Aff. ¶11.** Nina Nguyen and Leah Harris, the other two employees in the area at the time were also interviewed. **McMath Aff.¶19, Ex. G.** Lons asked Rose Staley, UR nurse, to complete a chart review. **Id.** Staley did not see anything in the file to indicate Chambers acted inappropriately or fraudulently. **Id.** Mustamaa and Childers met with Ward and Chambers to put the matter to rest. Both Ward and Chambers said they were willing to

5

continue to work together, thus closing the investigation. **Chambers Dep. at 166; Childers Aff. ¶11.**

*Other Complaints*

In September 2018, Chambers reached out to Cathleen Wheatley, System Chief Nurse Executive and Sr. Vice President, Clinical Operations, about the way he was being treated in the department. **Chambers Dep. at 323; Deposition of Cathleen Wheatley ("Wheatley Dep.") at 16-18.** Wheatley advised that discrimination was not tolerated at WFUBMC. **Id.** She then referred the matter to her peer, Dr. Todd Redden, AVP of Human Resources, who in turn referred the matter to McMath. **Wheatley Dep. at 19-21.**

The following week (on September 24, 2018) McMath met with Chambers in person for over two hours. **McMath Aff. ¶18, Ex. C.** Chambers' allegations again surrounding McKearney and the tension between the two of them (spanning from February to September). Chambers noted that he and McKearney do not work together so she had to be basing her negative comments about him on what was in the chart or what occurred after his shift was over. **Id.** Chambers admits that the only time McKearney ever made direct reference to race was a reference in 2017 when she reference the character Toby in *Roots*. **Chambers Dep. at 301, 310-311**. Chambers reported that he had concerns that Childers does not like having an African American male in the department, but never reported that Childers herself said that, just that he believed it to be true. **McMath Aff. ¶18, Ex. C**

6

While Chambers had been informed that his prior complaints had been investigated and addressed with the appropriate individuals, Chambers stated he did not believe they had been. **McMath Aff. Exs. A and C.** Chambers was invited to provide the names of any other witnesses that could be interviewed and ER would look into the allegations again if new information or people were brought forth. **Robbins Aff. at ¶8; McMath Aff at ¶20.** As a White female McMath questioned whether she was failing to appreciate any non-overt discrimination or unconscious bias. **Robbins Aff. at ¶7; McMath Aff at ¶19.** She was also concerned that in receiving a report from Chambers, he would go back to the very first incident with McKearney and did not seem to be able to move past any of the incidents and perhaps she was not being clear enough. **Robbins Aff. at ¶12; McMath Aff at ¶19.** Given these concerns, McMath asked her manager, Tonya Robbins (African American female) to review the matter to date and to meet with her and Chambers for the follow-up conversation about his concerns. **Robbins Aff. at ¶7; McMath Aff at ¶19.**

Since Chambers lived in Greensboro, McMath and Robbins met him in High Point. **Robbins Aff. at ¶10; McMath Aff at ¶21.** Chambers again relayed several concerns. **McMath Aff. ¶21, Ex. D (detailing all the allegations raised by Mr. Chambers on October 12, 2018), Robbins Aff. ¶10.** The concerns Chambers relayed started with the concerns he first raised in February 2018, which were investigated, which Chambers had been advised had been investigated, and had been closed with no finding of any

7

wrongdoing by Chambers and Dr. Harmon speaking with Ms. McKearney. **McMath Aff., Ex. A pages 1-2 and Ex B.**

Following their meeting with Chambers, Ms. McMath and Ms. Robbins further investigated his allegations. **Robbins Aff. at ¶12-14; McMath Aff. at ¶22-26, Exs. E-G.** They reviewed the case files related to Chambers' earlier 2018 complaints, interviewed Mustamaa (two times in total, once by McMath alone and once with both McMath and Robbins), interviewed Childers, gathered more documentation surrounding the investigation into the Ward/Blue Cross Blue Shield matter, and interviewed Dr. Harmon. **Id.**

In regard to the investigation and reinvestigations into Chambers complaints Robbins specifically looked at all of Chambers' complaints from the standpoint of an African American person working at WFUBMC. **Robbins Aff. ¶7.** As an African American in the Human Resources field, Robbins is exceptionally attuned to unconscious bias. **Id. at ¶11** Robbins concluded that there simply did not exist any evidence to support that anyone had made many of the allegations that Mr. Chambers' attributed to them (none of which he heard first-hand and were all hearsay), never mind that the same were based on race or gender. **Id. at ¶22-23.**

Chambers admits that he has had interpersonal problems with people of all races and genders (including African American males and females, White males and females, and Hispanic females). **Chambers Dep. at 343-345.** Chambers denies that any of those

8

that have complained about his interpersonal skills or job performance are correct and race and gender discrimination is the reason. **Chambers Dep. at 345-346; Robbins Aff. ¶23.**

*Care Coordination Supervisor*

In May 2018, Eglinger announced that she was taking a position outside of WFUBMC. Eglinger initially recommended to Childers and Mustamaa that Chambers should be selected for the position. Eglinger felt that Chambers was a good fit to fill the role of Supervisor. **Eglinger Dep. at 41; Childers Aff. ¶16.** Eglinger informed Chambers of her recommendation. **Eglinger Dep. at 41.** Not long after, Eglinger began getting complaints about Chambers' behavior and him acting as if he was already the supervisor and otherwise not acting as a leader should. **Id. at 47.** The reports received by Eglinger caused her to question her recommendation of Chambers. **Id. at 48.** She shared these complaints with Childers and Mustamaa and ultimately told them she had changed her mind and was no longer recommending Chambers for the position. **Id.** Ms. Eglinger shared these concerns even before the Supervisor position was posted. **Id.**

Following the typical review and approval process, the Care Coordinate Supervisor position was posted on July 5, 2018. **Childers Aff. ¶14.** Chambers applied for the position on July 13, 2018. **Id. at ¶15.** Other internal candidates (White and African American females) applied for the position. **Id. at ¶20.** None of the internal candidates were selected. **Id.** Chambers was interviewed by Lons, Childers, and Mustamaa. **Id. at ¶19.** On August 28, 2018, Chambers was informed that he was not selected for the Care Coordination

9

Supervisor position. **Id.** Mustamaa informed Chambers that he was not a good fit for the position and that two employees (one Hispanic female and one Black female) stated they would quit if Chambers was placed in the Supervisor role. **Chambers Dep. 172; McMath Dep. Ex. 16; McMath Aff. ¶23 and 25, Exs. E and G; Childers Aff. ¶17.**

On September 27, 2018 Colleen Kinslow (White female) was offered the Care Coordination Supervisor position. **Childers Aff. ¶21.** Kinslow had supervisor experience and was an LCSW. **Id. at ¶23. Childers Dep. at 74.** She turned down the same due to the commute being too long. **Childers Aff. at ¶21.** On October 24, 2018, Amanda Bright (White female) was offered the Care Coordination Supervisor position. **Id.** She also had an LCSW. On November 14, 2018 Amanda Bright turned down the Supervisor position. **Id.** Terrance Pleasants (African American male) was interviewed and on December 12, 2018 he was offered the Supervisor position. **Id. ¶22.** Pleasants interviewed very well, demonstrated great composure, showed great insight, had community-based knowledge, and supervisory experience. **Id.; Childers Dep. at 40-41.** Pleasants was also an LCSW. **Childers Aff. ¶23; Childers Dep. at 74.** On December 18, 2018 Pleasants accepted the Supervisor position and began working at WFUBMC on January 14, 2019. **Childers Dep. at 40; Childers Aff. ¶23.**

*EEOC Charge*

Chambers signed and filed his EEOC Charge on February 15, 2019. **McMath Dep. Ex. 16.** WFUBMC first received notice of the Charge on February 21, 2019. **Robbins Aff.**

**¶21.** In his Charge, Chambers alleged that he was discriminated against and denied an opportunity to promote based upon his race and sex. **McMath Dep. Ex. 16.** He noted that the earliest date of the behaviors was June 28, 2018 and ended on December 3, 2018. **Id.** Chambers did not check the retaliation box nor the continuing action box on the EEOC Charge. **Id.** In his Charge he alleged that on or about July 13, 2018, he applied for the Supervisor position. **Id.** He alleged that Childers and another employee (both White females) created a hostile work environment to undermine his abilities to perform his duties and have him disqualified for eligibility to be interviewed or selected. **Id.** He stated that Childers expressed that "he was too efficient and that [he] would show up [his] teammates." **Id.** He also noted that white employees are promoted but he was not. **Id.** He noted that on August 28, 2018 he was advised that he had not been selected for the job because of conduct concerns and two employee had threatened to quit if he was promoted. **Id.** He alleged he had raised concerns to all levels on several occasions but no actions were taken. **Id.** Finally, he alleged that the selection of Pleasants, a African American male was a cover up when they found out Chambers was going to make an EEOC complaint. **Id.**

*Post-EEOC Charge Actions*

McKearney left her job as the ED Social Worker in the Department of Psychiatry. **Childers Aff. ¶10.** Chambers expressed an interest in that position and by the Spring 2019, Chambers was placed in that position. **Id.** Chambers remains employed by WFUBMC, even though Ms. Childers and Mr. Mustamaa were aware he misrepresented his licensure on his resume both at the time he applied for hire and for promotion to the ED Supervisor

11

role, and continues to hold the Psychiatry Department ED Social Worker Position. **Chambers Dep. at 77; McMath Aff. at 27, Ex. G; Childers Aff. ¶24-25, Ex. B; Robbins Aff. ¶15.**

## QUESTIONS PRESENTED

I. Whether WFUBMC discriminated against Chambers on the basis of his race or gender.

II. Whether WFUBMC retaliated against Chambers.

III. Whether Chambers was subject to illegal harassment on the basis of his race or gender.

## ARGUMENT

### A. The Standard for Summary Judgment

Fed. R. Civ. P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answer to interrogatories, and admission on file, together with the Declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

However, the Rule does not provide that any factual dispute will defeat a motion for summary judgment. The Supreme Court has explained: "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [his] pleadings, but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003), *cert. den.* 541 U.S. 1042 (2004) (quoting Fed. R. Civ. P. 56(e)). "The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp*., 12 F.3d 1310, 1316 (4th Cir. 1993). While the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in his favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr. Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), the court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d, at 526 (*quoting Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

Case 1:19-cv-01229-LCB-LPA   Document 24   Filed 06/30/21   Page 13 of 28

B.    Summary Judgment Should be Granted as to Chambers' Failure to Promote
Discrimination Claim

Chambers alleges he was discriminated against based on his race and gender due to WFUBMC's failure to promote him to the Care Coordination Supervisor position. Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under that provision, it is unlawful for an employer to not promote an employee for racially discriminatory reasons. *See, e.g., Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994).

A plaintiff may establish a Title VII violation in two ways. First, a plaintiff can show through direct evidence that racial discrimination motivated an employer's adverse employment action. See, e.g., *Diamond v. Colonial Life & Accident Ins. Co*., 416 F.3d 310, 318 (4th Cir. 2005). If a plaintiff lacks direct evidence, a plaintiff can alternatively proceed under the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (*en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013).

14

Plaintiff has presented no evidence that any decisionmaker told him he was not selected as the Care Coordination Supervisor because of his race or gender. In his deposition Plaintiff admitted that when Mustamaa informed him that he was not selected for the job he was told that people threatened to quit if Chambers got the position and he was not a good fit for the position. **Chambers Depo. at 172-173; McMath Dep. Ex. 16; McMath Aff. ¶21.** Indeed, the very notion that Mustamaa, Childers, and Lons had any discriminatory animus against Chambers because he is an African American male is belied by the fact that those decisionmakers selected Pleasants, an African American male for the job. Further undermining any argument of race or gender bias against Chambers by Mustumaa or Childers is the fact that both involved in the decision to hire Chambers. *Accord Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1318 (4th Cir.1993) (when same decision maker both hires/promotes and terminates plaintiff, inference of nondiscrimination arises); and *Proud v. Stone*, 945 F.2d 796, 797-98 (4th Cir.1991) (same). Therefore, Plaintiff must proceed under the indirect burden of proving his case.

### *Chambers Cannot Establish a Prima Facie Case of Discrimination*

To establish a prima facie case of failure to promote based on race or gender, Chambers must show by a preponderance of the evidence that (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was not awarded the position under circumstances giving rise to an inference of unlawful discrimination. *Id., Robbins v. Rowan Vocational Opportunities,*

15

*Inc.*, No. 1:16CV310, 2018 WL 2338795, at *3 (M.D.N.C. May 23, 2018) (citing *Carter*, 33 F.3d at 458).

WFUBMC admits that Plaintiff satisfies the first two elements of his failure to promote claim. As an African American male, he is a member of a protected class and he applied for the Care Coordination Supervisor position. Defendant contends; however, that Plaintiff cannot establish the third and fourth elements of his claim.

Regarding the third prong, Chambers arguably met some of the day-to-day mechanical aspects of the Care Coordination Supervisor position; however, he did not possess the interpersonal and leadership skills required for the supervisor position. **Chambers Dep. 172; McMath Dep. Ex. 16; McMath Aff. ¶23 and 25, Exs. E and G; Childers Aff. ¶17.** Eglinger who originally suggested he be considered for the position withdrew her support of him in light of complaints from his peers and the revelation that while he was a very good social worker, he would not make a good supervisor. **Eglinger Dep. at 47-48.** Additionally, two individuals (one Hispanic female and one African American female) felt so strongly that Chambers not move in to the supervisor position that they indicated they would quit if he was selected thus he also lacked the trust of those he was expected to lead. **Chambers Dep. 172.**

Assuming *arguendo* that Chambers could establish the third prong of his failure to promote claim he cannot establish the fourth prong. There is no inference of unlawful discrimination. Indeed, the person placed in the Care Coordination Supervisor position was

16

Terrance Pleasants, an African American male. Thus, the individual placed in the position for which Chambers alleged he was discriminatorily denied *is the same race and gender as Plaintiff.* Courts have found that where a "member outside of the protected class received a promotion instead of the plaintiff is sufficient to create an inference of discrimination." *McCaskey v. Henry*, 461 F. App'x 268, 270 (4th Cir. 2012) (citing *Carter*, 33 F.3d at 458). Conversely, "courts have held that a plaintiff did not satisfy the fourth prong of the test for failure to promote where applicants of the same race [or gender]... as the plaintiff filled the positions for which he had applied." *Sonpon v. Grafton Sch., Inc.*, 181 F. Supp. 2d 494, 500 (D. Md. 2002); *Rodriguez v. Elon Univ.*, No. 1:17CV165, 2018 WL 1997987, at *5 (M.D.N.C. Apr. 27, 2018), aff'd, 751 F. App'x 395 (4th Cir. 2018).

In an attempt to overcome the inference in favor of WFUBMC, Plaintiff alleges that the job was only awarded to Pleasants because of WFUBMC's awareness of his intention to file an EEOC Charge. However, he provided no evidence of this series of events or the alleged discrimination and his unsupported speculation is insufficient to carry his burden in opposing summary judgment. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988) ("Plaintiff's own naked opinion, without more, is not enough to establish a prima facie case of discrimination.") This pure speculation is undermined by the chronology of events. Pleasants was offered the supervisor position on December 12, 2018, accepted the same on December 18, 2018 and began his employment on January 14, 2019. Chambers did not sign his Charge until February 19, 2019 and the EEOC issued a Notice of Charge

to WFUBMC on February 21, 2019. Moreover, Childers and Mustamaa hired Plaintiff, did not terminate Plaintiff even after discovering he misrepresented his licensure status, and never disciplined Chambers while he worked under their chain of command. In light of these undisputed facts, Chambers cannot establish that Pleasants was hired in order "to disguise its own act of discrimination toward the plaintiff." *See Miles v. Dell, Inc.,* 429 F.3d 480, 488 (4th Circ. 2005)(quoting *Brown v. McLean,* 159 F.3d 898, 905-06 (4th Cir. 1998)).

*WFUBMC Has Proffered Legitimate Nondiscriminatory Reasons for the Failure to Promote Chambers.*

Assuming, however, that Plaintiff had established a prima facie case of discrimination (which is strongly denied), WFUBMC has articulated several legitimate, non-discriminatory reasons for declining to promote Plaintiff. Pleasants was offered the position because he presented professionally and with great composure, he had significant knowledge of the community mental health continuum, had a clinic licensure (LCSW), and he had experience supervising a staff. **Childers Dep. at 40-41**. Conversely, Chambers did not show that he could be clear in relaying his thoughts or explaining his processes, did not seem open to feedback, nor display the insight into what was going on "behind the scenes." **McMath Aff., Exs. E and H**. While not required for the position, an LCSW or LCSW-A was preferred, which Chambers lacked. **Childers Dep. at 46**. Indeed, every person who was offered the Care Coordinator Supervisor position held an LCSW. **Id. at 74**.While interviewing for the Care Coordination Supervisor two individuals (one Hispanic female

18

and one African American female) stated that they did not know if they could work with Chambers, had concerns about him as a supervisor, and threatened to quit their positions if he was hired. **Childers Dep. at 73.**

*Chambers Cannot Establish Pretext.*

Chambers has no evidence that these reasons were in any way pretextual or that his race or gender was somehow a factor in the decision. Chambers cannot create a material issue of fact on pretext by simply asserting that he was more qualified than any others interviewed for the position or otherwise laud his capabilities.

A plaintiff can only rebut an employer's proffered legitimate reason by proving "*both* that the reason was false, *and* that discrimination was the real reason for the challenged conduct." *Jiminez*, 57 F.3d at 377-78 (internal quotation marks omitted). Here, Plaintiff has not produced evidence that WFUBMC's reason was false nor has Plaintiff produced evidence that discrimination was the real reason for the challenged conduct. Plaintiff has provided only speculation and conjecture that the denial must have been based on his race or gender origin because he believes himself to have been better qualified. **Complaint at Section III, Part E.** However, it is not Plaintiff's judgment that matters here. "It is the perception of the decision maker" that is relevant. *Rowe v. N. C. Agricultural and Technical State Univ.*, 630 F.Supp.2d 601, 611 (M.D.N.C. 2009) (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)). Here, there is no evidence that the decisonmakers based their decision on Planitiff's race or gender.

19

C.     Summary Judgment Should be Granted as to Chambers' Retaliation Claim.

*Chambers' cannot establish a prima face case of retaliation*

To make out a prima facie case of retaliation, Chambers must prove that he (1) engaged in a protected activity; (2) suffered an adverse employment action; and (3) there is a causal nexus between the protected activity and the adverse action. *Brockman v. Snow*, 217 Fed.Appx. 201, 206 (4th Cir. 2007) (*citing McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir. 1991).

Title VII prohibits, in relevant part, an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). "This requires that the plaintiff: (1) have a good faith belief that the employer is engaging in an unlawful employment practice; and (2) that the belief is objectively reasonable in light of the facts." *Coleman v. Loudoun County Sch. Bd.*, 294 Fed.Appx. 778, 781 (4th Cir. 2008) (internal citation omitted).  General complaints of mistreatment, without more, do not give rise to protected activity. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (noting that Title VII is not a "general civility code for the American workplace").

Even a fair reading of Mr. Chambers' complaints show that he made more general complaints of mistreatment than complaints giving rise to protected activity. But for the purposes of summary judgment, WFUBMC will submit that Chambers can establish the first prong of the prima facie case.

20

WFUBMC submits that Chambers can satisfy the second prong.

*Chambers Cannot Establish a Causal Connection*

To satisfy the third element of the prima facie case, the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity. As the Fourth Circuit has made clear, "[s]ince, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case*." Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (employer's decision maker unaware that plaintiff ever filed EEOC charge; prima facie case not established). Chambers has proffered no evidence that the decisionmakers were aware that he made any complaints of race or gender discrimination or intended to file an EEOC Charge prior to August 28, 2018, the date on which he was informed of his non-selection. While Chambers made allegations regarding Childers tied to race and gender, Childers was not aware of any such allegation until December 2018. **Childers Aff. ¶26.**

*WFUBMC had Legitimate Non-Retaliatory Reasons for Not Selecting Chambers and Chambers Cannot Show Pretext.*

WFUBMC submits that its non-discriminatory reasons for not selecting Mr. Chambers discussed above are equally applicable to establish a legitimate non-retaliatory reason for non-selection and that he cannot establish pretext.

21

## D.    Plaintiff's Hostile Work Environment Claim Fails as a Matter of Law

### *The Harassment Claim is Outside the Scope of the EEOC Charge*

Under Title VII, plaintiffs are required to file a Charge of Discrimination with the EEOC within 180 days of the allegedly unlawful employment practice. 42 U.S.C. 2000e–5(e)(1). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). Claims that fall outside of the scope of the EEOC charge are procedurally barred. *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995). The Fourth Circuit has "long recognized that '[t]he scope of the plaintiff's right to file a federal lawsuit is determined by' the contents of the charge filed with the [EEOC]." *Jones v. Southpeak Interactive Corp. of Delaware,* 777 F.3d 658, 669 (4th Cir. 2015) (first alteration in original) (quoting *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009)).

In the narrative of his Charge (**McMath Dep. Ex. 16**), Plaintiff does not reference harassment or allege he believed he had been harassed based on his race or gender. *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir.2002). ("Administrative investigation of retaliation ... could not reasonably be expected to occur in light of Bryant's sole charge of race discrimination, and the investigation of the complaint did not touch on any matters other than race discrimination.").

22

*Plaintiff Cannot Establish a Prima Facie Case of Harassment*

Even assuming *arguendo* that Chambers can proceed with his harassment case, it still fails as a matter of law. To state a claim for harassment under Title VII, a plaintiff is required to set forth sufficient allegations to demonstrate that there was: "(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race [or gender]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (*quoting Okoli v. City of Balt*., 648 F.3d 216, 220 (4th Cir. 2011)). Harassment is considered sufficiently severe or pervasive so as to alter the terms or conditions of employment if a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult.'" *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

As the Fourth Circuit recently reinforced, the standard for analyzing the imputability requirement "is informed by the status of the alleged harasser." *Bazemore v. Best Buy*, 957 F.3d 195, 201 (4th Cir. 2020); *see also Vance v. Ball State Univ*., 570 U.S. 421, 424 (2013) ("an employer's liability for such harassment may depend on the status of the harasser"). If the alleged harasser is the plaintiff's supervisor, the employer will be either strictly or vicariously liable for the supervisor's actions. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 333 (4th Cir. 2018).

Plaintiff cannot show that the alleged behavior he suffered from was due to his race or gender. He also cannot establish that the behaviors rose to the level of severe or pervasive or that the terms and conditions of his employment were altered. In assessing whether conduct is so severe and pervasive, "not all incidents of hostility or those of an offense nature are of such significance that a hostile work environment is created." *Strickland v. Melton Jewell*, 2007 WL 4069923 (M.D.N.C. 2007); *Hartsell v. Duplex Prods. Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) ("Title VII is not a federal guarantee of refinement and sophistication in the workplace.") Factors to be examined in assessing a hostile work environment are "(1) frequency of the incidents, (2) their severity, (3) whether the incidents were physically threatening or humiliating or merely offensive, (4) whether the conduct unreasonably interfered with the Plaintiff's work, and (5) what psychological harm resulted. *Id.* at \*9, citing *Conner v. Schrader-Bridgeport International, Inc.*, 227 F.3d 179, 192 (4th Cir. 2000).

Taking the facts in the light most favorable to the Plaintiff, as a matter of law, he lacks sufficient evidence to prove his claim. Here, Chambers' "evidence" does not come close to establishing a racially or gender-biased hostile work environment. His allegations amount to the following: (1) a single untimely comment by McKearney in 2017 referencing a character in Roots; (2) an alleged comment by Childers regarding Chambers being a large African American male; (3) Chambers' belief that McKearney's complaints and the actions of others were related to his race and gender (despite no evidence that race

or gender were mentioned); and (4) inadequate investigations despite the fact that hours had been spent meeting with Chambers and others to investigate his issues. Many of the allegations by Chambers were hearsay which cannot be considered by this Court.

Chambers cannot establish that any of this conduct was gender-based or racially motivated, and he has made no showing of an abusive atmosphere. *See, e.g.*, *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (stating that plaintiff's complaints about supervisor's harsh management style "are without a hint of racial significance" and noting that even if supervisor "harbored some personal dislike of Hawkins that made Hawkins' job more difficult or stressful, '[a]n employer is not required to like his employees'" (citing *Cerberonics*, 871 F.2d at 457).

Chambers allegations, by and large, amount to the type of generalized problems which occur between people in the workplace, not the type of behavior protected by Title VII. As such, Chambers' harassment claim should be dismissed as a matter of law. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir.2008) (stating that Title VII does not act as a code of civility for the workplace, and incidents that give rise to bruised or wounded feelings without more will not satisfy the severity requirement); *Baqir v. Principi,* 434 F.3d 733, 747 (4th Cir.2006) (stating that merely rude treatment is not actionable); *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir.2003) (finding "callous behavior" by supervisors was not actionable).

## CONCLUSION

For the foregoing reasons, WFUBMC is entitled to judgment as a matter of law on Plaintiff's claims.

This the 30th day of June, 2021.

> **/s/ Kristine M. Sims**
> Kristine M. Sims, Bar No. 26903
> Email: ksims@constangy.com
> **/s/ Gerard M. Clodomir**
> Gerard M. Clodomir, Bar No. 54176
> Email: gclodomir@constangy.com
> CONSTANGY, BROOKS, SMITH
> & PROPHETE, LLP
> 100 N. Cherry Street, Suite 300
> Winston-Salem, NC 27101
> Telephone: (336) 721-6849
> Facsimile: (336) 283-0385
>
> *Attorneys for Defendant Wake Forest*
> *University Baptist Medical Center*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for the foregoing **DEFENDANT WAKE FOREST BAPTIST MEDICAL CENTER'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** is less than 6,250 words. The word count excludes the case caption, signature lines, cover page, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of the word-processing system used to prepare the memorandum.

This the 30th day of June, 2021.

**/s/ Kristine M. Sims**
Kristine M. Sims
NC State Bar No. 26903
Email:  ksims@constangy.com
CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP
100 North Cherry Street, Suite 300
Winston-Salem, NC  27101
Telephone: (336) 721-1001
Facsimile:  (336) 748-9112

*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed **DEFENDANT WAKE FOREST BAPTIST MEDICAL CENTER'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **Geraldine Sumter** (gsumter@fergusonsumter.com).

This the 30th day of June, 2021.

/s/ Kristine M. Sims
Kristine M. Sims, Bar No. 26903
Email: ksims@constangy.com
CONSTANGY, BROOKS, SMITH
& PROPHETE, LLP
100 N. Cherry Street, Suite 300
Winston-Salem, NC 27101
Telephone: (336) 721-6849
Facsimile: (336) 283-0385

*Attorney for Defendant Wake Forest University Baptist Medical Center*

7589218v.1