IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-CV-01229-LCB-LPA

ANDRE FLOYD CHAMBERS,     )
          )
     Plaintiff,     )
          )
     v.     )
          )
WAKE FOREST UNIVERSITY     )
BAPTIST MEDICAL CENTER,     )
          )
     Defendant.     )

**PLAINTIFF'S RESPONSE TO DEFENDANT WAKE FOREST BAPTIST MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT**

**STATEMENT OF FACTS**

**<u>Background</u>**

Plaintiff Andre Chambers graduated from Benedict College in 2004, and in 2012, he received his master's degree in Social Work and a certificate in drug and addition studies from the University of South Carolina. (Chambers' Deposition (hereinafter "Chambers' Dep." Vol. I 14:23-25; 15:1-7). In 2013, Plaintiff received his provisional license to practice social work. (Chamber's Dep. Vol. I 39:13-19; See Attachment 9).

In August 2015 Plaintiff was hired by Defendant Wake Forest University Baptist Medical Center as an Emergency Department Social Worker. (Chambers' Dep. Vol. I 80:6-9). In this role, Plaintiff's direct supervisor was Cynthia Eglinger, who reported to Linda Childers. (Chambers' Dep. Vol. I 30:3-5). Plaintiff was later transferred to the Psychiatry Unit as the Psych Transfer Coordinator. At all times relevant to this matter, Plaintiff received evaluations indicating that he met or exceeded performance expectations and was recognized for his work by his peers. (See

Attach. 10). Plaintiff was asked by Dr. James Kimball, the Psychiatry Department Head, to be supportive of Care Coordination wellness. (Chambers' Dep. Vol. II p 18). Plaintiff was the only person in his department to receive the hospital-wide award of Employee of the Month twice. (Chambers' Dep. Vol. I 93:7-25; 92:23-25; 93:1-3). Throughout Plaintiff's tenure in the Emergency Department, Plaintiff's direct supervisor, Eglinger sought Plaintiff's advice about certain processes and improvement to providing patient care. (Chambers' Dep. Vol. I 103:15-19). Eglinger reported to Human Resources ("HR") that she did a lot of administrative work and relied upon Plaintiff to carry the shift. (McMath Dec. ¶ 18).

**Plaintiff's Complaints Regarding Susan McKearney**

In February 2018, Plaintiff reached out to Catherine McMath of Employee Relations after Plaintiff received a text and a phone call from Eglinger regarding a complaint of allegations of violent behavior towards Susan McKearney (white female) that was supposedly witnessed by Brandi Forbes (white female). (Chambers' Dep. Vol. I 122:12-25; 123:1-24). To Plaintiff's knowledge, there was no formal conclusion to the investigation, and neither McKearney nor Forbes were counseled for the false allegations despite Defendant's policy prohibiting such conduct. (See Attach. 11) Plaintiff vehemently denied the allegations and believed them to be racially motivated. (Chambers' Dep. Vol. I 74:2-17; 81:24-82:2). Plaintiff was the only African American male in the department and felt that he was being racially profiled. *Id.* Plaintiff's belief was based on McKearney's complaint and her referring to him as "Toby", a recognized racially derogatory term. (Chambers' Dep. Vol. II pp. 72-73).

Eglinger testified that the allegations were contrived.

> A. I believe that the conclusion was – is that she felt that, you know, she had been doing this role for quite some time as the psych transfer coordinator and that Andre was telling her how to do her job. And

2

she -- she did not take well to that. But I do believe that she came back and said, you know, **"*Hey, I -- I do not feel threatened. I just didn't like what he had to say*."**

(Cynthia Eglinger Dep. 48:21-25; 49:1-12) (emphasis added).

Later in 2018, Plaintiff made another complaint about McKearney, again, indicating that he was concerned about her spreading rumors about Plaintiff being violent against her and stating that she was fearful of her safety. (Chambers' Dep. Vol. I 134:2-15). To Plaintiff's knowledge, no disciplinary action was taken against McKearney.

At or around the same time Plaintiff complained about McKearney, Plaintiff was aware that his white female co-worker, Miranda Hill, reported threatening behavior by her white male co-worker, Curtis Reaves, to Childers. (Chambers' Dep. Vol. I 144:4-25; 146:1-25; 147: 1-25). To Plaintiff's knowledge, the matter was fully investigated, and Reaves was terminated. *Id.* Plaintiff's concerns were not treated with the same care. *Id.* There was no meeting with the group to discuss the policies, and there was no appropriate intervention to prevent McKearney or Forbes from spreading false allegations about Plaintiff or to clear Plaintiff's name of the false allegations. (See Chambers' Dep. Vol. I 140: 3-25; Chambers' Dep. Vol. II pp. 25, 30, 78-81). The allegations of Plaintiff being aggressive were repeated throughout the department and then to new residents in the department. (Chambers' Dep. Vol. II p. 111-12; See Attach. 8).

**Plaintiff Is Passed Over for the Care Coordinator Position**

In July 2018, Plaintiff applied for the Care Coordinator Supervisor Position. (Eglinger Dep. 47:13-15). On August 28, 2018, Kurt Mustamaa called Plaintiff to inform him that he had not been selected for the Care Coordination Supervisor role. (See Attach. 12). Further, Mustamaa had previously told Plaintiff that the Care Coordination Unit was not ready for an African American male supervisor. (Chambers' Dep. Vol. II pp. 88-89). On September 27, 2018, the ED

3

Coordination Supervisor role was offered to Colleen Kinslow, a white woman. On October 24, 2018, after Kinslow turned down the role, the position was offered to Amanda Bright, also a white woman. Bright also declined the role. (Childers Aff. ¶ 21). While Kinslow and Bright were indeed licensed clinical social workers, which was a preferred qualification for the role, Plaintiff had previously been licensed as a Licensed Clinical Social Worker Associate (LCSWA). Tara Lons, a white woman, and a Care Coordination Manager, who interviewed Plaintiff for the Care Coordination Supervisor role, was neither a Licensed Social Worker nor a Licensed Social Worker Associate but she was able to serve in a supervisory capacity in a Coordination role. (See Childers Dep. 74:1-25).

Plaintiff spoke with Tonya Robbins, an African American woman, and a member of the HR Department, the first week in November 2018 after Amanda Bright was offered the position. In that conversation, Plaintiff can be heard telling Robbins that the denial of the promotion was discriminatory and racist. (See Attach. 13).

Defendant has promulgated policies on conduct which applies to all employees. They provide, among other things, that Defendant is committed to maintaining a work environment where threats, discrimination, harassment, retaliation, intimidation and other disruptive behaviors are not tolerated and that they should be reported. (See Attachs. 14 and 31).

Defendant's policies also outlined in detail that harassment and discrimination are prohibited, and that behavior should be reported even if the inappropriate behavior is not directed to the person making the report. (See Attach.11).

Plaintiff maintains that the investigations regarding his complaint about McKearney were not thoroughly investigated. In fact, when they were initially raised, a cursory examination was undertaken. (See Attach. 28). Only after Plaintiff escalated his complaints through the upper

4

management was there a more thorough investigation occur. And even at that time, Defendant did not examine whether there was a racial connotation to the behavior by McKearney. (See Attach. 15). Plaintiff contacted McMath on February 2, 2018, about a co-worker spreading false allegations against him. (See Attach. 16). McMath suggested an action plan. After Defendant received Plaintiff's EEOC Charge in February 2019, it undertook a more thorough investigation that still did not focus on Plaintiff's allegations of race discrimination. The proposed action plan to address Plaintiff's concerns was that Dr. Harmon would discuss with the team that they are to be professional and not slander or gossip to co-workers. No mention was made of the need to refrain from discriminatory language. When McMath met with Plaintiff in September 2018, he expressed concerns that Childers did not like having an African American male in the Department. (See Attach. 17).

On or about September 7, 2018, Plaintiff contacted Dr. Cathleen Wheatley, who was then the President of the Winston-Salem Wake Forest Baptist Medical Center campus, to express concerns for his job and his fear that Childers was discriminating against him due to his race and gender. (Chambers' Dep. Vol. I 149:1-23; Wheatley Dep. pp. 12, 16-17). She forwarded the information to Dr. Todd Redder, who referred it to McMath. (Wheatly Dep. pp 19-20).

At the October 12, 2018, meeting with Robbins and McMath, Plaintiff advised them of a meeting between the Psychiatry Department and Care Coordination on the development of standard operating procedures for Care Coordination for how they managed the patients. He had been identified as a point person for the SOP for managing patients. Before the meeting began, Plaintiff was advised by his Supervisor, Eglinger, that Mustamaa had been notified by Patrick Harmon that McKearney felt concern for her safety because Plaintiff was going to be present. (See Attach. 18).

Plaintiff reported to HR that Childers held a discriminatory animus towards him. That perception and belief was based on his observation of how she treated him whenever his white co-workers raised concerns about him. In one instance, Childers had directed him to take over a case that was being handled by Lauren Sykora. When Sykora complained that she was being told what to do by Plaintiff, Childers reproached Plaintiff. Plaintiff reminded her that he only took over the case because she asked him to do so. Even then, Childers asked him to think about apologizing to Sykora. (See Attachs. 19 and 28). Further, in the meeting between Plaintiff and Childers at his annual performance review, Childers again brought up the situation between him and Sykora and asked if they were okay. Mr. Chambers advised her that he was concerned about the questioning of his work.

In the annual performance meeting, Childers made a comment about Plaintiff being a bigger black man. Childers told Plaintiff, "You being a bigger black guy, as muscular as you are it's problematic when interacting with others. You can't help your size." (See Attach. 7). Plaintiff then asked if that would be a problem if he's being promoted. Childers responded, "Yes, some people have problems interacting with you because of your stature as a bigger black man." *Id.*

In his meeting with Robbins and McMath, Mr. Chambers specifically advised them that he was concerned that Childers did not address the issues that were being raised by him or the issues against him. In addition, he believed that co-workers and others could make unfounded allegations against him, and no investigation was undertaken to address the impropriety of that behavior. (See Attachs. 19 and 28).

Plaintiff's work and decisions continued to be scrutinized and criticized including expectations that he was to perform work for which the Care Coordination Unit was responsible, even though he had been transferred out to the Psychiatry Department. When he expressed

6

concerns, he was threatened with discipline for insubordination. He had not been insubordinate but had simply been following the process and procedures of Defendant to express concerns to his management when he had them. In fact, Plaintiff has a history of working to help others and to do his best to improve the delivery of care to patients. The fact that he was twice nominated for, and received, the Employee of the Month award, and was nominated on a third occasion to receive the Employee of the Month award belies these false allegations. (See Attach. 20).

December 12, 2018, Pleasants, an African American male, was hired for the position. (McMath Aff. ¶ 29). Plaintiff made all levels of leadership aware of the discrimination that he experienced in the Department of Care Coordination, including President Julie Freischlag, Wake Forest Baptist University Medical Center CEO:

1. February 16, 2018—Plaintiff made his first complaint of discrimination indicating that McKearney was making false allegations about Plaintiff. Plaintiff indicated that he believed he was targeted because of his race. (See Attach. 21).

2. September 7, 2018—Plaintiff reached out to Cathleen Wheatley indicating that he was concerned for his job and in fear that Childers was discriminating against him due to his race and gender. (See Attach. 22).

3. September 18, 2020—Plaintiff sends an e-mail to HR discussing race discrimination, harassment, and emotional distress. (See Attach. 23).

4. September 26, 2018—Plaintiff sent an e-mail to Wheatley following up on their conversation about targeting, slander, harassment, workplace bullying, and past investigations. (See Attach. 24).

5. October 12, 2018—Plaintiff had a meeting with Robbins and McMath about being discriminated against for his race and gender. (See Attach. 25).

6. November 2018— Plaintiff told Robbins that he believed that the hiring practices for the Care Coordination Supervisor position was discriminatory. (See Attach. 13).

7. August 26, 2019—Plaintiff contacted HR about being harassed and intimidated by an employee in another department. (See Attach. 26).

As a result of Plaintiff reporting the experience of discrimination to HR, Childers and other Care Coordination Department employees began to retaliate against Plaintiff. Plaintiff was forced to work shifts alone after another co-worker left the department in October 2018. Childers and other Care Coordination administrators made no effort to assign or reorganize PRN/part-time employees or shift full-time employees to support Plaintiff during these shifts even though this was requested multiple times. Prior to Plaintiffs report of discrimination to HR, there were 2-3 people working each shift. After the report of discrimination, when Plaintiff was working alone for several months, the opposite shifts remained with 2-3 employees at all times. While working alone, Plaintiff often had to ask Childers for assistance with matters pertaining to the job. Many times, she would not answer her phone at all or respond to any emails requesting support. However, when white co-workers called or emailed her, she gave immediate and supportive responses. After Plaintiff told Defendant that he intended to file an EEOC Charge of discrimination in December 2018, the retaliation increased as the Care Coordination administrators, including Childers, frequently began to target particular cases that Plaintiff worked with in order to look for any wrongdoing.

Additionally, once the new supervisor, Pleasants, was selected in December 2018, Plaintiff was told that he would have to train him. (Chambers' Dep. Vol. I 175:7-20). When Plaintiff declined to take on this responsibility, he received a reproachful email in which the Care Coordination Director, Mustamma, admonished him for this despite the fact that training

8

employees is not listed as a part of Plaintiff's job description. The workplace became much more hostile, and Plaintiff applied for a lateral position outside of the Department of Care Coordination with the Psychiatry Department as an effort to avoid the behavior from Childers and Department Care Coordination administrators. Childers attempted multiple times to block Plaintiff from getting the psychiatric transfer coordinator position, despite the fact that the Psychiatry Department wanted to interview and hire Plaintiff. This was done by falsely reporting that there were negative entries in Plaintiff's personnel file.

**Other Incidents of Harassment of Plaintiff**

At one point, Plaintiff was falsely accused of purporting to be a LCSW. In 2020, Clint Stiles, social worker, wrote a letter to the North Carolina Licensure Board stating that Plaintiff was misrepresenting that he was a LCSWA. (Chambers' Dep. Vol. II 55:8-12).

Additionally, in 2021, Michael Vollmer spread rumors that Plaintiff had threatened Cardinal Innovations, a partner company of Defendant, with legal action. (Chambers' Dep. Vol. II 44:9-2). To Plaintiff's knowledge, Michael Vollmer was not disciplined for spreading rumors about Plaintiff. Plaintiff denied ever threatening Cardinal Innovations. Further, Cardinal has expressed that there was no threat made to them. (Chambers' Dep. Vol. II 123:6-10).

As a result of the rumors, Doctor Kimball threatened Plaintiff with a write up that was eventually withdrawn (Chambers' Dep. Vol. II 45:11-13). Plaintiff reported the false accusations to McMath and, through Doctor Kimball, found that the allegations of the threats were unsubstantiated. (Chambers' Dep. Vol. II 122:8-25; 123:1-8; McMath Dep. 122:13-125:4).

**ARGUMENT**

**A.    Standard of Review**

The United States Supreme Court ruled in *Tolan v. Cotton*, 572 U.S. 650, 134 S.Ct. 1861 (2014) stated that a court's function at summary judgment is not to "determine the truth of the

9

matter, but to determine whether there is a genuine issue for trial." *Id.* at 1866, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In *Tolan*, the Court held that the Fifth Circuit failed to review the evidence at summary judgment in a light most favorable to Tolan with respect to the central facts of the case. *Id.* at 1866. By failing to credit evidence that contradicted some of its key factual conclusions, the Court improperly "weighed the evidence" and resolved disputed issues in favor of the moving party. *Id.* (citing *Anderson*, 477 U.S. at 249).

**B.   Defendant's Motion for Summary Judgment On Plaintiff's Failure to Promote Claim Should Be Denied.**

Plaintiff alleges that he was not selected for the Care Coordination Supervisor position because of he is an African American male.[1]  In a race discrimination case, Plaintiff may prove his case by either producing direct evidence of discrimination or using the burden shifting framework announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973).

In this matter, Plaintiff proceeds under the direct evidence theory.  Plaintiff's evidence shows that one of the decision makers, Childers, the Manager of the Care Coordination Department used racially derogatory terms in reference Chambers.  Specifically, while discussing a matter involving a white female who had falsely accused the Plaintiff of threatening and assaulting her, Childers made the comment that "you being a bigger black man, and as muscular as you are, it's problematic … ."   She also said that this could be an issue with the promotion.  This direct evidence of racial animus is sufficient to impute liability for race discrimination to Defendant.  At the time that she made the comment, Childers served as Plaintiff's Second-Line Supervisor.  Her

---

[1] Defendant argues that Plaintiff cannot prove his case because the same persons who were involved in his hiring were involved in the decision not to promote him.  Plaintiff notes that the cases cited by Defendant do not indicate that when the decision maker is the same person involved in the Plaintiff's hiring that it automatically defeats the claim of discrimination.  While a presumption may arise, both *Proud v. Stone*, 945 F.2d 796 (4TH Cir. 1991) and *Mitchell v. Data General Corporation*, 12 F.3d 1310 (4th Cir. 1993), hold that there arises in such circumstances a rebuttable presumption that race was not a factor.  Linda Childers was the only person who was involved in both interviews.  (See Attach. 7).

opinions carry significant weight with the Director of the Department, Mustamaa, to whom she reported directly. Indeed, the comment infuses the entire process with a racial animus.

Further, Mustamaa told Plaintiff directly that the Care Coordination Department was not ready for an African American male supervisor. This direct evidence from the ultimate decision maker, Mustamaa, indicates clear racial bias and is sufficient to deny Defendant's Motion for Summary Judgment. A reasonable jury could conclude that race was a motivating factor under Title VII or a "but for" factor under § 1981.[2]

Defendant's evidence shows that Mustamaa informed Plaintiff that he did not obtain the position because people threatened to quit if Chambers got the position and that Chambers was not a good fit for the position. Plaintiff's direct evidence of discrimination through the comment of Childers about Chambers and Mustamaa's comments is sufficient evidence from which a jury could conclude that the real reason that Plaintiff was not hired for the position was because he was an African American male.

The fact that another African American was hired for the position is not determinative and should be examined in the context in which that hiring was made. Terrance Pleasants, did not initially apply for the Care Coordination Supervisor position. (Childers Dep. p. 40.) Indeed, Mr. Pleasants' application was for a social worker position. An objective review of his resume shows that at the time that he was selected for the position, not only was Plaintiff more familiar with the exact position in question and had performed the duties of that position when his supervisor was absent, the evidence also shows that Plaintiff had better qualifications than Pleasants. (See Attach. 29). All of this evidence, coming at a time when Plaintiff had repeatedly expressed his concerns about discrimination, is sufficient to rebut a presumption that race was not a consideration.

---

[2] Plaintiff has moved to amend his complaint to include an allegation of discrimination and retaliation under § 1981.

**C.    Plaintiff's Evidence Is Sufficient to Deny Defendant's Motion for Summary Judgment on His Retaliation Claims.**

Plaintiff can prove a claim of retaliation under Title VII and U.S.C., §1981 for opposing race discrimination in employment.   See *CBOCSW., Inc v. Humphries,* 553 U.S. 442, 446 (208). Title VII and §1981 protect an employee who opposes race discrimination when he "communicates to [his] employer a belief that the employer has engaged in" discrimination.  *Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tennessee*, 555 U.S. 271, 276 (2009).  In order to state a claim for retaliation, the Plaintiff must allege "facts rendering it plausible that, but for [his] participation in protected activity, [he] would not have suffered a materially adverse action. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 – 218 (4th Cir. 2016).

Plaintiff alleges that he was denied the promotion to the position of Care Coordination Supervisor in the Fall of 2018 in retaliation for his complaints of discriminatory treatment to Defendant.  Plaintiff complained of discriminatory treatment to HR in February 2018, July 2018, September 2018, October 2018, November 2018 and December 7, 2018.  His complaints stemmed from the racially stereotypical remarks of a white coworker and the endorsement of those comments by his supervisor.  Plaintiff made his complaints known to HR, Cathleen Wheatley, President of the Wake Forest Baptist Medical Center, and the President of the hospital, Dr. Julie Freishlag.  Internal complaints of discrimination are protected activity.  See, *Ali v. BC Architects Engineers, PLC.*, 832 F. Appendix 167, (4th Cir. 2020).

In 2018, Colleen Winslow was offered the position of Care Coordinator Supervisor but declined it.  Thereafter, Amanda Bright was offered the position but also declined it.  Plaintiff had applied for the position and had been interviewed.  He initially was supported in his efforts by his former supervisor, Cynthia Eglinger.  Once the false and malicious rumors began about him, his application was affected by that and Eglinger supposedly waivered in her support.  Defendant,

12

rather than offering Plaintiff the position after the two white females declined, continued its search to find someone other than Plaintiff to fill the position. Defendant offered the position to Pleasants, an African American male with no experience with the hospital and no experience in the emergency department of a hospital. Mustamaa told Plaintiff that he was not hired for the position because he was not a good fit. Plaintiff was determined not to be a good fit based upon malicious and false allegations about him being threatening to people in the department. Plaintiff had reported concerns about these false allegations, but Defendant had taken no effective actions to avert the behavior of Plaintiff's coworkers.

In order to establish a claim for retaliation, a Plaintiff must show that he engaged in protected activity; that his employer took an adverse action against him; and that a causal connection existed between the adverse activity and the protected action. *Id. at 706*. The employer is then given an opportunity to rebut the assumption by articulating a legitimate non-retaliatory reason for its actions. *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). Plaintiff then must show that the proffered reason is pretext. *Id.*

It is not disputed that Plaintiff engaged in protected activity when he complained to HR about race discrimination. Further, it is not disputed that Plaintiff was denied the promotion to supervisor on the Care Coordination Unit.

Plaintiff relies upon the close proximity of his complaints to HR to establish the retaliatory animus. On December 7, 2018, Plaintiff told McMath and Robbins that he was about to file and sign his EEOC Charge. (See Attach. 7). See, *Ali v. BC Architects Engineers, 832 F. Appx. at 173*. *In Haulbrook v. Michelin N.A., Inc.*, the court found that two weeks between complaint and termination supported an inference of retaliation. *Haulbrook v. Michelin N.A., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001). (Temporal proximity alone can create a genuine dispute as to causation.)

With respect to the pretext issue, Plaintiff relies upon the evidence that he presents with respect to the denial of the promotion based on race. It is clear that Childers did not wish to have Chambers appointed as the supervisor. Her racial animus and her complicit nature in voicing the stereotypical animosity of two of Plaintiff's white coworkers is sufficient to override Defendant's articulated reason that Plaintiff was not hired because he was not a good fit. Defendant's evidence that Plaintiff did not get along with his coworkers and that two people said that they would quit if he were hired as the supervisor is disputed. Plaintiff's evidence is to be taken in the light most favorable to him. A reasonable jury could conclude that Defendant's evidence is unworthy of belief and that the real reason that he was not appointed to the position is because of the retaliatory animus and their desire not to have him in the position. Further, a jury could disbelieve Defendant's articulation that Plaintiff was not selected because he was not a good fit.[3] This despite Plaintiff having been chosen as Employee of the Month in a hospital-wide honor. In fact, Plaintiff was again nominated for the award within three months of his non selection for the position.

Plaintiff was informed in August 2018 that he was not selected for the position. Plaintiff never withdrew his application for the position. Defendant's selection of Pleasants, who was seeking only an entry level position with the company, was not sufficient to overcome Plaintiff's evidence of race discrimination.

Defendant maintains that there could be no retaliation because Plaintiff's charge of discrimination was filed with the EEOC in February 2019 which occurred after Pleasants was selected. Defendant overlooks the internal complaints of discrimination made by Plaintiff. Defendant was aware of Plaintiff's complaints of discrimination and was aware that Plaintiff was

---

[3] In his telephone call to advise Plaintiff that he was not being promoted, Mustamaa told Plaintiff that some people said they would quit if Plaintiff was selected. He admitted that he could not validate the reasons. (See Attachment 12).

14

considering resorting to outside sources, as he had tried to get some resolution to his underlying concerns.

There exists genuine issues of material facts regarding Defendant's articulated reason for denying Plaintiff the position. As such, summary judgment on this issue would be inappropriate.

**D.   Defendant Is Not Entitled to Summary Judgment on Plaintiff's Hostile Work Environment Claim.**

Defendant asserts that plaintiff's hostile work environment claim must fail as a matter of law because he did not allege a hostile work environment claim in his charge of discrimination to the EEOC.   Defendant's argument is without merit.

In his EEOC charge plaintiff stated "My Department Manager (White/Female) and another employee (White/Female) created a hostile work environment."   These words are enough to form the basis for a hostile work environment claim in this lawsuit. (See Attach. 30).

The Fourth Circuit has held that while a Title VII Plaintiff must exhaust administrative remedies by filing a charge of discrimination with the EEOC, the EEOC charge defines the scope of a Plaintiff's rights to institute a civil suit.   "An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of a civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Chisholm v. United States Postal Service, 665 F.2d 482, 491 (4th Cir. 1981.* The Fourth Circuit has also held that litigation may encompass claims "reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans v. Tech. Applications and Serv. Company*, 80 F.3d 954, 963 (4th Cir. 1996).

In *Sydnor v. Fairfax County, Virginia*, 681 F.3d 591, 595 (4th Cir. 2012), the Fourth Circuit stated that "the touchtone for exhaustion is whether Plaintiff's administrative and judicial claims

are 'reasonably related,' not precisely the same[.]" *(quoting Smith v. First Union National Bank*, 202 F.3d, 234, 247 (4th Cir. 2000). "So long as a Plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, she may advance such claims in her subsequent civil suit." *Sydnor* at 594. "It is a generally accepted principle [in the Fourth Circuit] that the scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission." *Fulmore v. City of Greensboro,* 834 F. Supp. 2d, 396, 422 (M.D.N.C. 2011) quoting *Nealon v. Stone,* 958 F.2d 584, 590 (4th Cir. 1992) *quoting Hill v. W. Electric Company,* 672 F.2d 381, 390 note. 6 (4th Cir. 1982) (internal quotation marks omitted).

In order to make a claim for a hostile work environment under Title VII or 42 U.S.C., §1981, Plaintiff must show that he was subjected to unwelcome conduct based on his race/sex, which was both objectively and subjectively offensive, that was so severe or pervasive that it affected his workplace and was imputable to the employer. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016). When the harassment comes at the hand of a manager and a tangible adverse employment action results, the employer is strictly liable for that conduct. *Burlington Industries Electric v. Ellerth,* 524 U.S. 742, 765 (1998). When the harassment is from co-workers, if the Defendant has a remedial action plan, it may avail itself of the affirmative defense. Defendant then must show that it investigated the complaint and took proper remedial action to eliminate the problem. *Id.* The continuation of the problem may be evidence that the remedial actions were ineffective.

In the present case, Plaintiff has provided evidence of racially harassing behavior by his co-workers, including false allegations that he was physically threatening to them. Defendant was

16

made aware of two such allegations made by McKearney in 2018 which were later echoed by Brandi Forbes.  In addition, later in 2018, Sykora also made comments about Plaintiff being threatening.  In response to those complaints, Childers remarked to Plaintiff that he was a bigger black, muscular man who would appear to be threatening to others and that he should consider how his white female co-workers felt.  The fact that his manager would endorse the racist stereotypical allegations made by Plaintiff's white co-workers is evidence of a hostile work environment that is created or ratified by the supervisor.  Some allegations and comments are more offensive than others.  Clearly, a supervisor advising an African American male that he was threatening because of his size and race is offensive, both subjectively and objectively.

In this country, there is a history of African American men being falsely accused by white females of inappropriate conduct or threatening, aggressive behavior.  Among the more noted examples are the brutal murder of Emmett Till after having been falsely accused of making eye contact and smiling at a white woman during the summer of 1955 in Mississippi.  Other more recent events include Susan Smith, on national television, accusing a non-existent Black man of kidnapping her children, when in fact she had driven her car with her children strapped into their car seats into a lake.  Even more recently, Amy Cooper accused a Black male bird watcher of attacking her and her dog in Central Park, New York when video clearly shows no such thing happened and showed her making a false report to the police department.  The behavior of these women, like the women making false complaints about Chambers, are all based on stereotypes, even though racial words are not always used.  These baseless allegations have historical context of which Chambers was well aware and for which he believed required a full vetting, not as some personality conflict, but for the racist implications entuned in the comments.

17

Plaintiff's evidence indicated that not only did McKearney make the comments in February of 2018, but that she repeated them later on in the year including an occasion where she claimed to be afraid to attend a joint department meeting because Plaintiff was there. This matter was of great concern to Plaintiff as he noticed that others in the Psychiatry Department where Ms. McKearney worked, also were expressing concern about him. (Plaintiff's Dep. – Vol 2 pp 111-13).

Defendant asserts that it talked to individuals about this matter and McMath testified that she thought she might have been unaware of some implicit bias in the behavior and comments made so she elicited assistance from an African American co-worker, Tonya Robins. At no point did McMath, Childers or anyone else specifically investigate whether race was a motivating factor in the behavior that Mr. Chambers experienced. This, despite the fact that he specifically raised the question of race discrimination and hostile work environment when he spoke with McMath and when he spoke to Wheatley in the Fall of 2018. See Dep. of Wheatly and Deposition of McMath.

Plaintiff shows that he was subjected to conduct that was offensive, both subjectively and objectively. He also shows that he did not receive a promotion to a position for which the Defendant viewed him as qualified enough to grant him an interview. Further, two white women were selected for the position, but declined it, and an African American male who did not even apply for the position was selected and placed in the position. Plaintiff maintains that the denial of the Care Coordination Supervisor position was a tangible adverse employment action as a result of the hostile work environment to which he was subjected, particularly the involvement of Childers, given her racist stereotypical remarks made to him during his annual performance evaluation. The denial of the position and the ongoing scrutiny of him in the department altered

18

his work environment. He testified that he was begging Defendant to address the racial component of his coworkers' behavior. (Chambers Dep. Vol. II p 102.) Plaintiff noticed that when white employees raised issues or concerns about the way they were treated, Defendant would address the issue including holding meetings to discuss the issues in the department. (Chambers Dep. pp 99-103.) The same treatment, respect and professionalism was not provided to him. Plaintiff became so concerned about Defendant's failure to address the underlying racist content of the complaints about him that he would work in an area that had cameras in order to insulate himself from false allegations of aggression and intimidation. (Chambers Dep. pp 113-116).

Plaintiff has presented evidence of managers specifically addressing his status as an African American male. These comments may not have been pervasive but they were severe, especially when Plaintiff was told that he should have a "tougher" skin on race issues. Giving voice to one of the most demeaning stereotypes (angry black man, menacing black male) is severe harassment. It is for a jury to determine if Plaintiff was subjected to a hostile work environment.

## **CONCLUSION**

For the forgoing reasons, the court should deny the Defendant's Motion for Summary Judgment.

This 9th day of August, 2021.

*/s/ Geraldine Sumter*_____
Geraldine Sumter
N. C. Bar No. 11107
Chandler Bryant
N.C. Bar No. 55058
Ferguson Chambers & Sumter, P.A.
309 East Morehead Street, Suite 110
Charlotte, North Carolina 28202
Telephone: (704) 375-8461
Facsimile: (980) 938-4867
Email: gsumter@fergusonsumter.com
Email: cbryant@fergusonsumter.com

Attorneys for Plaintiff

19

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), the undersigned certifies that the word count for the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT WAKE FORST BAPTIST MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT** is less than 6,250 word. The word count excludes the case caption, signature lines, and required certificates of counsel. In making this certification, the undersigned has relied upon the word count of the word-processing system used to prepare the memorandum.

*/s/ Geraldine Sumter*_____
Geraldine Sumter
N. C. Bar No. 11107
Chandler Bryant
N.C. Bar No. 55058
Ferguson Chambers & Sumter, P.A.
309 East Morehead Street, Suite 110
Charlotte, North Carolina 28202
Telephone: (704) 375-8461
Facsimile: (980) 938-4867
Email: gsumter@fergusonsumter.com
Email: cbryant@fergusonsumter.com

Attorneys for Plaintiff

20

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT WAKE FORST BAPTIST MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participant:

> Kristine M. Sims
> Constangy, Brooks, Smith & Prophete, LLP
> 100 North Cherry Street, Suite 300
> Winston-Salem, North Carolina 27101
> Telephone:     (336) 721-1001
> Facsimile:     (336) 748-9112
> Email: **ksims@constangy.com**

This 9th day of August, 2021.

> <u>/s/ Geraldine Sumter</u>
> N.C. Bar No. 11107
> Chandler Bryant
> N.C. Bar No. 55058
> Ferguson Chambers & Sumter, P.A.
> 309 East Morehead Street, Suite 110
> Charlotte, North Carolina 28202
> Telephone:   (704) 375-8461
> Facsimile:   (980) 938-4867
> E-mail:  gsumter@fergusonsumter.com
> E-mail:  cbryant@fergusonsumter.com
>
> Attorneys for Plaintiff

21