IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ANDRE FLOYD CHAMBERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19-CV-1229 |
| | ) | |
| WAKE FOREST UNIVERSITY | ) | |
| BAPTIST MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiff initiated this action *pro se* on December 17, 2019, alleging race and sex discrimination, retaliation, and maintenance of a hostile work environment against his employer, Defendant Wake Forest University Baptist Medical Center ("Defendant" or "Wake Forest Baptist"), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17. (ECF No. 1.) He is now represented by counsel. (ECF No. 14.) Before the Court is Defendant's Motion for Summary Judgment, (ECF No. 23). For the reasons stated herein, the motion will be granted in part and denied in part.

## I.  BACKGROUND

Plaintiff, an African American male, was hired to work for Defendant as an Emergency Department Social Worker in August 2015. (*See* ECF No. 28-1 at 80:6-9 (Plaintiff dep. I).) According to Plaintiff, during his tenure at Wake Forest Baptist, he received strong evaluations in this role and was twice named the hospital-wide Employee

of the Month.  (*Id.* at 93:21-25; 99:25–100:4.)  Despite these achievements, Plaintiff in his Complaint claims that he was discriminated against because of his race and sex in that: (1) Defendant maintained a hostile work environment by allowing fellow employees to harass him with no negative consequences; (2) Defendant refused to promote him because of his race and gender, and (3) Defendant refused to promote him in retaliation for his internal reports of sex and race discrimination.  (ECF No. 1 at 7–9.)

In his deposition testimony, Plaintiff testified that he was harassed during his tenure at Wake Forest Baptist by a white coworker, Susan McKearney.  (ECF No. 28-2 at 78:9-14 (Plaintiff dep. II).)  According to Plaintiff, McKearney "mention[ed] on multiple times that she was scared [of him] and she was worried about [him] as an African American male." (*Id.* at 78:1-4.)  One such example occurred in 2017, McKearney alluded in conversation with Plaintiff to Toby, an enslaved African man from the novel and TV series *Roots*.  (*Id.* at 72:22–73:2.)  Another coworker, Megan Pinder, confirms hearing McKearney spread rumors about Plaintiff "on a daily basis."  (ECF No. 28-8 ¶ 2 (Pinder decl.).)  McKearney later denied any racial animus toward Plaintiff by saying that she "voted for Obama."  (ECF No. 28-2 at 78:25–79:5 (Plaintiff dep. II).)

In February 2018, Plaintiff attended an interdepartmental meeting with Pinder, McKearney, and two other coworkers.  (ECF No. 28-8 ¶ 7 (Pinder decl.).)  According to Pinder, McKearney spontaneously interrupted the meeting by screaming at Plaintiff.  (*Id.* ¶ 8.)  Another coworker then "got in [Plaintiff's] face" and demanded that he leave the meeting, to which he complied.  (*Id.* ¶¶ 9–10.)  Thereafter, McKearney and another coworker spread rumors that Plaintiff had been threatening in the meeting—rumors that got back to Plaintiff.  (*Id.* ¶ 14; ECF No. 28-1 at 132:1–133:3 (Plaintiff dep. I).)  Plaintiff

2

contacted the medical center's human resources department ("HR") to quell the rumors and preempt any investigation based thereon. (ECF No. 28-1 at 122:23–123:6, 134:7-15 (Plaintiff dep. I).) Pinder also informed HR that she could provide additional information about the incident; however, HR never followed up with her. (ECF No. 28-8 ¶ 15 (Pinder decl.).) According to Plaintiff, he was left to "protect . . . [him]self" from harassment and "create [his] own intervention." (ECF No. 28-1 at 143:5-9 (Plaintiff dep. I).) HR later informed Plaintiff that the investigation had been "shut down" by Linda Childers, a manager at the medical center. (Id. at 143:10-14.) McKearney's rumors about Plaintiff continued to circulate for months after Plaintiff's report to HR. (ECF No. 28-8 ¶ 17 (Pinder decl.).) Meanwhile, according to Plaintiff, when a white female colleague reported being harassed by her white male coworker, HR conducted a full investigation and ultimately fired the harasser. (ECF No. 28-1 at 144:4-25, 145:23–147:16 (Plaintiff dep. I).)

Around June 2018, Plaintiff had a disagreement with another coworker, Chanelle Ward, an African American woman. (Id. at 149:24-25, 150:18-21.) The pair worked together to relay information about a patient to an insurance representative. (Id. at 156:3-21.) Afterward, Ward accused Plaintiff of lying to the insurance representative and committing fraud. (Id. at 157:22-24.) Plaintiff relayed his experience in an email to HR. (Id. at 160:15-16.) Plaintiff was not told whether HR completed an investigation of that allegation or whether he had been found to be at fault. (Id. at 165:14-22.) Plaintiff and Ward continued to clash thereafter. (Id. at 167:6-17.)

Plaintiff also testified that other colleagues treated him differently than his white coworkers. Tara Lons, a department manager from another department, for example, paid close attention to Plaintiff's work habits, such as arrival and departure time, and shared that

information with others.  (ECF No. 28-2 at 30:3-25 (Plaintiff dep. II).)  According to Plaintiff, she did not observe white employees this closely.  (*Id.*)

Several co-worker complaints involved Plaintiff "acting outside of [his] job responsibilities" and "doing things that were supervisorial."  (*Id.* at 88:1-5; *see also id.* at 87:6-10.)  Kurt Mustamaa, Director of Care Coordination, met with Plaintiff to discuss these allegations.  (*Id.* at 88:11-13.)  According to Plaintiff, Mustamaa told him that "the department was not ready to have a "black male social worker" because "not everybody [in the department] was ready to have a black male social worker as a supervisor."  (*Id.* at 88:22–89:24.)

According to Plaintiff, Childers raised similar concerns in her annual performance review of Plaintiff.  (ECF No. 28-7 ¶ 2 (Plaintiff decl.).)  Plaintiff testifies that Childers said: "You being a bigger Black guy, as muscular as you are, it's problematic when interacting with others," and that his race, sex, and stature could impact his ability to obtain a promotion because "some people have problems interacting with you because of your stature as a bigger Black man."  (*Id.*)  Childers denies mentioning Plaintiff's race or build in the performance review meeting.  (ECF No. 24-1 ¶ 13 (Childers aff.).)

In July 2018, Plaintiff applied to for a promotion to Care Coordination Supervisor.  (ECF Nos. 28-1 at 169:4-6; 24-1 ¶¶ 14–15.)  Childers, Mustamaa, and Lons were tasked with filling the position.  (ECF No. 24-1 ¶ 19 (Childers aff.).)  The outgoing Supervisor suggested to Childers that Plaintiff would be good in the position.  (*Id.* ¶ 16.)  However, Ward and a Hispanic woman in the department told Childers that they would quit if Plaintiff received the supervisor position.  (*Id.* ¶ 17; ECF No. 28-1 at 172:13–173:12 (Plaintiff dep. I).)  Sometime later, Plaintiff was interviewed for the position by Lons and Childers.  (ECF

No. 24-1 ¶ 19 (Childers aff.).)  There is a dispute as to whether Mustamaa was also in the interview.  (*Compare id. with* ECF No. 28-7 ¶ 7 (Plaintiff decl.).)  Defendant did not promote Plaintiff, and he was informed of their decision on August 28, 2018.  (ECF No. 24-1 ¶ 19 (Childers aff.).)

Plaintiff believed that he was denied the promotion because of his race and reported as much to Defendant's president, Cathleen Wheatley in September 2018.  (ECF Nos. 28-1 at 149:1-23 (Plaintiff dep. I); 28-4 at 16:22–17:25 (Wheatley dep.)  Plaintiff avers that he informed HR around December 12, 2018, that he would file a discrimination charge with the EEOC.  (ECF No. 28-7 ¶ 10 (Plaintiff decl.).)

After offering the position to two white women, Defendant ultimately hired Terrance Pleasants, an African American man, for the job on December 18, 2018.  (ECF No. 24-1 ¶¶ 21–22.)

Plaintiff submitted a charge to the Equal Employment Opportunity Commission ("EEOC") on February 15, 2019, alleging racial discrimination and retaliation.  (ECF No. 28-30.)  The EEOC dismissed Plaintiff's charge on September 19, 2019, and subsequently issued him a right-to-sue letter.  (ECF No. 1 at 10.)  This lawsuit followed.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotations omitted).  "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant . . . and

to draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569, and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324.

Hearsay that is inadmissible at trial cannot be considered on a motion for summary judgment. *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). "Hearsay" is any out of court statement offered as evidence of the truth of the matter asserted. Fed. R. Evid. 801(c). Hearsay is inadmissible unless exempted or excepted from this general rule. Fed. R. Evid. 802.

## III.  DISCUSSION

### A.    Race and Sex Discrimination

Defendant first moves for summary judgment on Plaintiff's claim of Race and Sex Discrimination under Title VII.  (ECF No. 24 at 14–19.)  Specifically, Defendant argues that Plaintiff has presented no evidence to support his claim that he was denied promotion to the Care Coordination Supervisor position because he is an African American male.  (*Id.*)

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The purpose of Title VII is "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973).  "Title VII tolerates no racial discrimination, subtle or otherwise."  *Id.* at 801.

A plaintiff can establish unlawful discrimination "through two avenues of proof."  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (emphasis omitted).  First, "[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision."  *Id.*; *see Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir.), *as amended* (Mar. 26, 2019), *cert. denied*, 140 S. Ct. 381 (2019) ("A Title VII plaintiff may make this showing of intentional discrimination using direct or circumstantial evidence.").  Second, a plaintiff may proceed using the "'pretext' framework, under which the employee, after establishing a prima facie

Case 1:19-cv-01229-LCB-LPA   Document 33   Filed 11/03/21   Page 7 of 18

case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Diamond*, 416 F.3d at 318 (referencing *McDonnell Douglas*, 411 U.S. at 801).

To survive summary judgment under the first avenue, Plaintiff must "produce direct evidence of a stated purpose to discriminate" or "circumstantial evidence of sufficient probative force to reflect a genuine issue of material fact." *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). The evidence must "bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Thus, the evidence must generally indicate that the *decisionmaker* mas motivated in whole or in part by the plaintiff's race or gender, i.e. "the employer's formal decisionmaker or a subordinate who was 'principally responsible for,' or 'the actual decisionmaker behind,' the allegedly discriminatory action." *See Holley v. N.C. Dep't of Admin.*, 846 F. Supp. 2d 416, 427 (E.D.N.C. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151–52 (2000)). A plaintiff's "naked opinion, without more, is not enough to establish a prima facie case of . . . discrimination." *Goldberg*, 836 F.2d at 848.

Here, Plaintiff has produced direct evidence from which a reasonable jury could find that that the decision by Defendant and its managers not to promote him was based, at least in part, on his race. It appears from the record that Plaintiff was denied a promotion in part because of conflicts with his coworkers. Two coworkers threatened to quit if Plaintiff was promoted, and Plaintiff's supervisors were aware of a number of other interpersonal conflicts involving Plaintiff. Plaintiff presents evidence that the committee directly responsible for hiring the Care Coordination Supervisor based their decision not to

8

promote him based in part on these conflicts. While Plaintiff's interpersonal conflicts with employees alone would not likely be sufficient to demonstrate that the decision not to promote Plaintiff was based on race, Plaintiff submits additional evidence that two of the three committee members believed these conflicts arose because of Plaintiff's race and sex. Mustamaa's statement to Plaintiff that "the department was not ready to have a black male social worker" because "not everybody [in the department] was ready to have a black male social worker as a supervisor" suggests that race may have been a motivating factor in his denial of promotion. Similarly, Childers' statements to Plaintiff that his interpersonal conflicts stemmed from his "stature as a bigger Black man," and that this would weigh against a decision to promote him, ties race to the interpersonal conflicts that he was having with fellow-coworkers as outlined above. Taken together, if a jury credits Plaintiff's testimony, it could find that either the committee effectively adopted the racial attitudes of Plaintiff's coworkers or at least denied his promotion to avoid escalating racially motivated interpersonal conflicts. Mustamaa and Childers both deny making these statements. There is, therefore, a genuine issue of material fact as to whether the committee denied Plaintiff's promotion because of his race and the racial attitudes of his coworkers.

Defendant argues that there is no evidence that the two coworkers who threatened to quit—both of whom are women of color—opposed Plaintiff's promotion because of his race or sex. The critical issue here, however, is whether the *decisionmakers* believed Plaintiff would be unable to lead the department because of his race and acted on that belief by denying Plaintiff the promotion. Plaintiff has presented direct evidence that two of the three decisionmakers—Mustamaa and Childers—did in fact believe that was the case and further acted on that belief.

Finally, Defendant argues that the fact that it ultimately hired Pleasants, an African American man, to fill the supervisor job contradicts Plaintiff's assertion that he was denied the promotion based on his race or sex. However, the question is not whether Mustamaa and Childers were hostile to an African American male supervisor generally, but whether *Plaintiff* was denied a promotion because of his race or gender. Pleasants' hiring may ultimately persuade a jury that Mustamaa and Childers were not motivated based on race; however, this fact alone does not entitle Defendant to judgment as a matter of law. *See, e.g.*, *Sonpon v. Grafton Sch., Inc.*, 181 F. Supp. 2d 494, 500 (D. Md. 2002) (finding the "relatively easy" prima facie test for racial discrimination satisfied where plaintiff's supervisor called her a "lazy African" and refused to promote her, notwithstanding that the person ultimately hired was also African American).

For these reasons, Defendant's motion for summary judgment will be denied as to Plaintiff's Title VII Discrimination claim.

**B.     Retaliation**

Defendant next moves for summary judgment of Plaintiff's Title VII Retaliation claim. (ECF No. 24 at 20–21.) Specifically, Defendant argues that Plaintiff has failed to present evidence to show a causal connection between his internal reports of racial harassment and Defendant's decision not to promote him. (*Id.* at 21.) Alternatively, Defendant argues that it has legitimate, non-retaliatory reasons for not promoting Plaintiff, and he has failed to present evidence to rebut these proffered justifications. (*Id.*, *see also id.* at 18–19.)

Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter."

§ 2000e-3(a). As stated above, "[a] plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the burden-shifting framework of *McDonnell Douglas*." *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (citing *McDonnell Douglas*, 411 U.S. at 802). Under the burden-shifting framework, a plaintiff establishes a prima facie case of retaliation by showing: "(1) [the employee] engaged in a protected activity; (2) the employer acted adversely against [the employee]; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Id.* The burden then shifts to the employer "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* at 328. Finally, the burden shifts back to plaintiff to show that "the employer's purported nonretaliatory reasons were not its true reasons but were a pretext for discrimination." *Id.*

i.    Plaintiff has made a prima facie showing of retaliation

For purposes of summary judgment, Defendant does not dispute that Plaintiff can satisfy the first and second prongs of his prima facie case. (ECF No. 24 at 20–21.) Instead, Defendant argues that Plaintiff cannot establish a causal connection between his protected activity and the adverse action. (*Id.* at 21.)

Establishing a causal relationship at the prima facie stage is "not an onerous burden." *Strothers*, 895 F.3d at 335; *see Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012) ("[V]ery little evidence of a causal connection is required to establish a prima facie case of retaliation."). At this stage, a plaintiff need not show but-for causation. *Strothers*, 895 F.3d at 335. Instead, a plaintiff can establish causation at this stage by showing that "(1) the employer either understood or should have understood the employee to be engaged in

11

protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Id.* at 336.

The first of these two elements is met when a defendant learns of plaintiff's action and "understood or should have understood [the action] to be opposition against a Title VII violation." *Id.* Whether the employer should have understood the nature of the employee's action is assessed with reference to the full factual context known to the employer. *Id.*

Under the second element, "temporal proximity is sufficient to establish a causal connection at the *prima facie* stage." *Id.* at 336–37. While "temporal proximity" is not strictly defined, the Fourth Circuit has found a causal connection "where the employer, with knowledge of a pending discrimination complaint, fired plaintiff approximately four months after the complaint was filed." *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)).

Here, Plaintiff routinely complained to Defendant's HR department and his supervisors about being targeted by his coworkers for mistreatment based on his race. He testified that McKearney and others spread rumors about him being aggressive, threatening, and unprofessional, and believed these false rumors to be racially motivated. It appears that he made these internal reports leading up to and after his interview for the Care Coordination Supervisor position. Based on Plaintiff's testimony, a reasonable jury could find that Plaintiff's internal complaints constituted reports of a racially hostile work environment, a Title VII violation. Further, there is some evidence that both Mustamaa and Childers in fact understood (and agreed) that Plaintiff was reporting racial harassment.

Plaintiff sought an investigation of his conflict with Ward in June 2018, and apparently complained of racial discrimination in his meetings with Mustamaa and Childers soon thereafter. He was then denied the promotion in August 2018. This temporal proximity is sufficient to satisfy the causal connection between the protected activity and the adverse employment action at this stage of the proceeding. Thus, Plaintiff has made a prima facie showing of retaliation.

ii. <u>No evidence suggests that Defendant's legitimate reasons were pretextual</u>

As mentioned, once a plaintiff establishes a prima facie claim of retaliation, the burden shifts to defendant to show it had legitimate reasons for its employment decision. *Strothers*, 895 F.3d at 327. Plaintiff then bears the burden to show these proffered reasons are pretextual. *Id.* "[M]ere knowledge" of a protected activity "is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons" for an adverse action. *Carter*, 33 F.3d at 460. Ultimately, Plaintiff must be able to show by preponderance of the evidence that, but for his protected activity, he would not have suffered the adverse employment action. *Id.*

Here, Defendant offers evidence that Plaintiff was not promoted because of his interactions with other employees. (*See* ECF No. 24-1 ¶¶ 17–18 (Childers aff.).) Specifically, Childers reports receiving complaints about Plaintiff, including from two employees who said that they would quit if Plaintiff was promoted and one who was "visibly shaken" after interacting with Plaintiff. (*Id.*) Childers also averred that every candidate

13

offered the position was a Licensed Clinical Social Worker ("LCSW"), and while an LCSW was not required, it was preferred. (*Id.* ¶ 23.) Plaintiff lacked that licensure.[1] (*Id.* ¶ 24.)

As discussed above, there is a genuine question of material fact as to whether Childers and Mustamaa viewed Plaintiff's interpersonal conflicts as racially motivated. However, there is no evidence that Defendant denied Plaintiff the promotion in retaliation for his complaints of racial discrimination and harassment. Even taking all evidence in the light most favorable to plaintiff, the evidence supports that Defendant decided not to promote Plaintiff because of his coworkers' complaints, not because Plaintiff complained about his coworkers. Thus, the Court is unable to conclude that a reasonable jury could find that he was denied the promotion in retaliation for engaging in protected activity.

Accordingly, Defendant's motion for summary judgment will be granted as to Plaintiff's Title VII Retaliation claim.

## C. Racial Harassment and Hostile Work Environment

Lastly, Defendant moves for summary judgment on Plaintiff's claim that Defendant allowed racial harassment to create a hostile work environment. (ECF No. 24 at 22–25.) Specifically, Defendant argues that this claim fails because (1) the claim is outside the scope of Plaintiff's EEOC charge, and (2) Plaintiff cannot establish a prima facie case of harassment. (*Id.*)

### i. Plaintiff's claim is not outside his EEOC charge

---

[1] Plaintiff stated on his resume that he was a Licensed Clinical Social Worker Associate ("LCSW-A"). (ECF No. 28-9 at 2.) It was later discovered (after he was denied the promotion) that his associate license expired before he started working for Defendant. (ECF No. 24-1 ¶ 24 (Childers aff.).)

14

To bring a claim under Title VII, a plaintiff must first exhaust his administrative remedies by filing that charge with the EEOC. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 508 (4th Cir. 2005) (citing 42 U.S.C. § 2000e-5e(1)). Thus, the scope of a subsequent Title VII lawsuit will be limited to "those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996).

Here, Defendant argues that Plaintiff did not allege racial harassment in his EEOC filing. (ECF No. 24 at 22.) However, Plaintiff stated in his EEOC charge that "My Department Manager (White/Female) and another employee (White/Female) *created a hostile working environment* that was supported by the Department Director (White/Male) to undermine my abilities to perform my duties and to have me disqualified for eligibility to be interviewed and be promoted to the Supervisor ED position." (ECF No. 28-30 at 2 (emphasis added).) He further stated that he was "defamed continuously by a White/female employee." (*Id.*) Plaintiff's racial harassment and racial discrimination claims are intertwined, and a reasonable investigation of Defendant's decision not to promote Plaintiff would include investigation of this racial harassment and hostile work environment allegation. Thus, the Court finds that Plaintiff's racial harassment claim is within the scope of his EEOC charge.

        ii.     <u>A reasonable jury could find Defendant liable for racial harassment</u>

To hold an employer liable for a hostile work environment under Title VII, a plaintiff must show that he suffered harassment that was (1) unwelcome, (2) based on race or gender, (3) "sufficiently severe or pervasive to alter the conditions of [his] employment,"

and (4) imputable to the employer. *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009) (internal quotations omitted). The first element is subjective to Plaintiff's experience. *Id.* The second element is met by showing that, but for plaintiff's race or sex, he would not have been the victim of the harassment. *Id.* (citing *Jennings v. Univ. of N.C.* 482 F.3d 686, 723 (4th Cir. 2007)).

Under the third element, the trier of fact "must look at all the circumstances to determine whether a work environment is hostile or abusive." *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 193 (4th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Five factors are relevant to this inquiry: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the plaintiff's work performance; and (5) what psychological harm, if any, resulted." *Id.* (citing *Harris*, 510 U.S. at 23).

The fourth element, imputability "is informed by the status of the alleged harasser." *Bazemore v. Best Buy*, 957 F.3d 195, 201 (4th Cir. 2020). If the harasser is a supervisor, the employer may be either strictly or vicariously liable for the harassment. *Strothers*, 895 F3d at 333. If the harasser is a coworker, the plaintiff must show that the employer "knew or should have known about the harassment and failed to take effective action to stop it." *Id.* at 332 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).

Here, Plaintiff testified that he was falsely accused of threatening a female coworker. This rumor was promulgated and repeated by enough coworkers that, eventually, new hires viewed Plaintiff as aggressive and dangerous without ever meeting him. Plaintiff clearly opposed these rumors and stated so in his report to HR. Thus, the first element, that the

harassment was unwelcomed, is met. With respect to the second element, that the harassment was based on race or gender, Plaintiff has presented some evidence that McKearney's original rumors were motivated by race. Specifically, McKearney's invocation of an enslaved African TV character and references to voting for President Obama, while not conclusive that the harassment was based on race or gender, are sufficient to create a genuine issue of material fact as to whether Plaintiff was accused of being threatening because of his race and gender.[2]

The third element, severity and pervasiveness, is a question of fact for the jury. Plaintiff has testified that the rumors were shared widely and adversely affected his relationships with his coworkers. Further, Pinder avers that McKearney actively lobbied against Plaintiff's promotion to Care Coordination Supervisor. (ECF No. 28-8 ¶ 24 (Pinder decl.).) As discussed above, Plaintiff has presented evidence that he was denied the promotion, at least in part, because of reports that he was difficult to work with. Thus, a reasonable jury could find that McKearney's harassment of Plaintiff was sufficiently severe and pervasive to alter the conditions of his employment.

With respect to the fourth element, imputability to Defendant, Plaintiff reported harassment by his coworker to Defendant's HR department in February 2018. According to Plaintiff and Pinder, Defendant's HR department did not conduct a thorough investigation, and McKearney was never disciplined. Consequently, the rumors continued

---

[2] In his brief, Plaintiff cites to what he describes as a long history of African American men being stereotyped and falsely accused by White women as aggressive, threatening, and violent. (ECF No. 28 at 17.)

to spread, and Plaintiff continued to suffer harm. Thus, a reasonable jury could find sufficient basis to impute liability to Defendant.

In sum, Plaintiff has presented evidence through his and Pinder's sworn statements that, if credited, would be sufficient for a reasonable jury to find Defendant liable for a racially hostile work environment. Accordingly, Defendant's motion for summary judgment will be denied as to Plaintiff's Title VII Hostile Work Environment claim.

## CONCLUSION

For the reasons stated herein, the Court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (ECF No. 23), is GRANTED in part and DENIED in part. It is GRANTED as to Plaintiff's Retaliation claim pursuant to Title VII. It is DENIED as to Plaintiff's remaining Title VII claims.

This, the 1st day of November 2021.


/s/ Loretta C. Biggs
United States District Judge